310-0646, Marlene Yuska, Tomika James, Tara Angel, versus Janet Hainberg and Andrew Steglitz-Angel, listed by Michael T. Reagan. Mr. Angel? Mr. Reagan? Justices, may it please the Court. We're here today on a case involving an estate with a decedent by the name of Edward Budd Aitutis. And this appeal essentially concerns the last year and a half or so of his life. Mr. Aitutis was born in 1918 on February 25th, 1918. He passed away on May 25th, 2005 at the age of 87 years old. He passed away from lung cancer, which metastasized to his hip, resulting in multiple health issues before he passed away. In the last year and a half of his life, Mr. Aitutis, and for some time before that, Mr. Aitutis owned several CDs, which are basically an issue in this case. Respondents who are nieces of Mr. Aitutis basically became power of attorney for him, assumed some responsibility for his care, and eventually ended up, after the power of attorney was executed, ended up with approximately four of his CDs totaling an approximate amount of $100,000. So that's why we are here today. The trial court found that the respondents did not commit any actual fraud and returned all the funds except for $10,000 where they admittedly did not act at Mr. Aitutis' direction by their own admission. So this appeal raises three issues regarding fiduciaries, which is becoming more of an issue as time goes on with what's known as the grain of America, an increasing elder population. Unfortunately, what comes with that is a risk of elder fraud, which is often very prevalent and very easy to accomplish, and many times very difficult, if not impossible, to detect. So for that reason, the courts and the General Assembly have basically instituted three rules which are pertinent to this case. There are others, but the three that are pertinent to this case basically guide fiduciaries' behavior with respect to handling the finances of the principal. The first issue is with regard to the Power of Attorney Act, and that law specifically requires that on statutory short form, which is what was used in this case, that the power to make gifts, change beneficiaries, change the estate plan, that power has to be specifically given. In this case, it's undisputed that the power of attorney did not grant those powers. Also, to protect principals from unscrupulous fiduciaries, the courts over several years, well before this court's decision in Skinner in 1969, have basically said that where a fiduciary is involved, and a fiduciary relationship may exist as a matter of fact or as a matter of law, such as with the power of attorney, agent, attorney, client, relationships like that, that in those cases that where there's any transaction between the principal and the fiduciary, heightened concerns are raised such that where the principal benefits, that there has to be one, not only clear and convincing evidence that a gift was actually made, since a lot of times these accounts turn out to be maybe intended for convenience, but also that where it's even shown that a gift was made or intended, there has to be clear and convincing evidence that the transaction was fair, equitable, and not the result of undue influence. The concern is... Anywhere, is there any evidence in there that the opposing party deprived Mr. Etudis of the use or benefit of any of his money during his lifetime? In other words, they did something to prevent him from getting medical care or enjoying what money he had while he was alive. No, actually, I do not believe there was, which actually goes to the issue of, was a gift ever intended? And that's an issue that came up in both the Skinner and the Heilman cases I cited in the brief, is that in those cases, aside from the fact that a lot of the transactions in those cases were not issues where the party claimed a gift until well after the scene had passed, and as those courts said, those claims are regarded with a high level of suspicion because it's almost impossible to disprove. But in those cases where the individual retains control of their funds, a real question arises, was this intended as a gift or was it intended for convenience to pay bills, things like that? In this case, the response... Were these joint accounts with survivorships? Three. Let's see with the CDs. The first account was a Mid-America, a CD of Mid-America Bank, which was in the amount of $25,000. That was changed on March 10, 2005, a week after the power of attorney was created. And the respondents were added, Ms. Hunenberg and her sister, Ms. Ziggler, were added as joint tenants onto that CD. The next CD... You know, as an operation of law upon the death of one of the... I mean, you're talking about gift, aren't you? Was his name still on them? His name was still on them. Okay. And I think, Justice Holder, I think where you're going with this is that basically where someone's name is put on as a joint tenant, there is a presumption of a gift. And normally that would hold true, except when there is a fiduciary relationship. And there are the... There's a conflicting presumption of funds and influence. And the question is how do those presumptions... Don't a lot of people do this in substitute of wills? I'm sorry? Substitution of wills. I want you to have the money when I'm gone. I mean, that's a possibility, but, of course, that's not complying with the formalities of the Wills Act. But also, by putting somebody on as a joint tenant... But the effect of it is, isn't it? That's correct in the sense that after the one joint tenant dies, the property passes to the surviving joint tenants. Well, back to Justice Smith's question. I mean, not deprived of anything during his lifetime, apparently. Is that fair factual assessment? There's nothing in the record that suggests that he was deprived of the funds, which basically suggests that... Which basically raises a real question as to whether a gift was even intended because he kept... What about the narrative I'm coming up with that says, you know, I just don't like lawyers and I don't like probate? I like these people and when I'm done with it, you can have it. And I can understand that... I mean, that's not an uncommon narrative, is it? I mean, I suppose, is that a possibility? Absolutely. But the problem is that's one possibility among several possibilities. One possibility is he didn't... Basically, he wanted bills paid and that's all it was. Another possibility is he wanted to make a gift but didn't do it. The problem is, is these transactions essentially are done in the dark. And what happened after... What happened with these transactions years after the fact is... It's almost impossible to figure out. As the trial court called our case, he said it was a series of inconsistencies. But in the vast majority of cases, all you're going to have is a series of inconsistencies. As Skinner and Heilman both recognized, direct disproof of the fiduciary statements, yes, they wanted me to have this, is very rarely occurs. That evidence very rarely exists. So basically, even though someone may have the mindset that you suggested, the law requires, because this is a situation where fraud is just rife to occur, that we want some assurances that these transactions were fair, above board, and not the product of undue influence. And there's a number of ways you can do that. And one way is the use of an attorney, who can be a disinterested person, says, yes, I counseled this person, and I told him what would happen, and he basically wanted to do this anyway. I concluded he was confident that he wasn't basically under the will of somebody else. That didn't happen here, not with this power of attorney, not with these gifts. He did have a power of attorney when his son became power of attorney. So, I mean, he obviously used attorneys. But the whole reason for having an attorney is you want some type of disinterested witness to say, yes, we can have some confidence in this transaction. Was there any behavior of these two, of the two nieces, that is different than the stepson? I mean, he has his stepson as his power of attorney from 2001 until 2004. And based on what I read is he did the same thing with the CDs that the nieces do from 2005 until Bud's passing. I mean, are you alleging that there was some different behavior or some indication that these were fraudulent? Yes, I think there was a lot of things different in that situation. First of all, the nephew never claimed a gift, not the nephew, I'm sorry, the stepson. Despite all the services provided, he never claimed that he was entitled to a gift, never asked for a gift. In fact, he didn't even ask to be paid for his services, which I think is important, because one thing that the parties do agree on is this was a man who was very frugal, and he's getting care at home from his stepson for essentially for free. So not only was the stepson not charging him or not claiming a gift, but also the stepson I think handled this in a lot of different ways. First of all, basically the stepson was using it to pay bills and only pay bills. A lot of times the stepson was in contact with the administrator and telling her how Bud was doing, how things were going, things like that. He told her when he cashed in some CDs I believe it was to pay for some nursing home expenses. And so there was a lot of things different there that didn't occur in this case. I mean, the stepson didn't move Mr. Itoudis out of his home in Peoria up to Spring Valley. Mr. Itoudis wasn't isolated from other individuals. I mean, you say isolated, but my reading was that he was moved because of the level of care that his stepson was providing him. And then after he stayed in residence with the nieces, that they took him to see his wife, that he did this banking and these things without them even coming into the bank, that he traveled to Peoria still three or four times a week sometimes. I mean, is it a fair characterization to say they isolated him? I think it probably is a fair characterization. Maybe it wasn't complete isolation, but yes, he did go down. There's a couple qualifications to that. First of all, the testimony as to what happened, where he was taken, was largely from the respondents. And, of course, that testimony, as Skinner and Heilman have stated, is not enough to discharge your burden. But also they did take him down to see, I believe they did take him down to see his wife, who was in the nursing home every so often. But those are also details which I don't think they wrote. Not only do they not go to the CDs, but basically his contact from what he had before was cut off. He's obviously not seen his wife as much as he was. Thank you. He also made it pretty clear he didn't want to live with him. His physician testified, didn't he, that this gentleman did not want to end his life in a nursing home. I think that's a fair assessment for any individual. But he wasn't required to live in a nursing home in Peoria. For example, I believe he was sent in January. And basically what the stepson testified to was that he actually enjoyed it there, but he got the bill. And that was basically it for the nursing home. And after that he was back in Peoria until October of 2004 when he was taken to Spring Valley with no forewarning to his wife, no forewarning to his stepson, no forewarning even to the administrator, Marlene Miska, who visited him several times per year and said he was well taken care of and talked to him on the phone on numerous occasions. And she said we were close and he never mentioned anything about going up to Spring Valley to us. So the fact that he didn't want to live in the nursing home I don't think really corroborates that he basically wanted to make gifts of his CDM. I think that's the lead. But in this case, basically the three ways besides the power of attorney act as far as protecting, as far as putting limitations, we also require limitations on convenience accounts and also for gifts, basically for showing a gift. And in this case, not only do we have the respondent's statements at various times basically saying this wasn't a gift, it was just to pay bills, and he's got health problems and he's a stingy individual. All those suggest that he wasn't giving up his money. Thank you. Thank you, Mr. Reagan. Mr. Reagan? May it please the court, counsel. My name is Mike Reagan and I represent Janet Humenberg and Edward Zegles, the defendants in the case. The arguments that are made by the plaintiff here don't have a unifying theme and they're sort of the smorgasbord of arguments, and I'm going to deal with them today in the way in which they were presented in the brief as best I can. With respect to argument one, we believe that the trial court properly found that the actions of Janet with respect to the two Bank of Spears CDs were the actions of Bud himself as opposed to being something that she did on her own in terms of either making a gift or changing the principles of the state plan. We don't contend that the power of attorney gave her the right to make a gift or to alter an estate plan, but she didn't do any of those things. All that she did was to act at Bud's direction to essentially sign on his behalf to accomplish what he ordered. If anyone made a gift or changed an estate plan, it was Bud himself and not Janet or Sandy. The trial court made very express findings to this effect. The court said that depositing the $12,000, which was one of the CDs at the Bank of Spears, into the checking account was essentially his decision, that is, his action. He wasn't doing it physically, but it was his action, quoting the court. And the court said that with respect to both the $12,000 CD and the $5,000 CD, which was the product split off from the $15,000 CD later, ended up being the acts of the principal. The trial court further expressly found that Bud also had full knowledge of what was done. The $12,000 in the first instance, and then the $5,000 CD, which was split off from the $15,000 later, were put into Bud's checking account. He signed checks in that account, and the court said it was abundantly obvious that he knew that the money was there, and that's where it went. Now, the trial court was scrupulously discriminating in its analysis on these points, and he concludes, you know, what happened, there's a $12,000 CD from the Bank of Spears, there's a $15,000 CD from the Bank of Spears, and Bud said, put the $12,000 in the account, I don't quite know what to do with the other $15,000, and they said, well, it makes sense to put it in a CD. So they put that in a CD, and when it came due, $5,000, it might have been put in three fives, I forget, and then when it came due, then $5,000 of it was taken and put into Bud's checking account. And the court expressly says in the record, we've documented, look, even though we don't think that the defendants here did anything wrong, we think they did it for proper purposes, it was the smart thing to do, nonetheless, Bud had not said to do that exactly, and so the court said that that remaining $10,000 still in the CDs, you know, was to go to the estate. And we haven't appealed, we haven't crossed the field with respect to that. We don't challenge it, we don't criticize it here at all. Now, the plaintiff wrongly accuses the trial court of, quote, ignoring Romanowski, and Romanowski's case, obviously, and the plaintiff's simply wrong. And the trial court did what I said he just did, because he said, I feel bound by Romanowski, and his understanding of what that case said. Romanowski was a completely different case, it was a woman who had the power of attorney, she created a trust, she took an income-producing piece of commercial property, put it into the trust, named herself and her daughter as contingent beneficiaries, and there it went. But the evidence in the case is also different, also very different in that case, because there was no evidence, there was no competent evidence of what the decedent had told her to do. There was some evidence, but it wasn't admitted, and it wasn't even in the proper offer of proof, which is what the court said. That somebody had talked to somebody at a bank, and the bank had said, talk to the woman, and the woman said, yeah, that's what I want to do, but it was all after the fact, and none of it came into the record, and that's the end of the whole end of the case. The court went on with some dicta, the court noted that there was no Illinois authority to support the dicta that the plaintiff relies upon. What we have here with respect to Argument 1 is that Budd was the person who did the volitional acts of either making a gift or changing his estate plan, his substitute for a will, if you will, and the trial court said he had done this for years. He had a number of brothers and sisters. He outlived most of all of them, and he would always change the names around, and he'd done that for decades, and that was his substitute for a will, and as the court said, it was apparent to the court that he wanted nothing to do with lawyers, and I shudder to think what he would think about what's transpired since his death. He had something to do with lawyers, the first power of attorney. He did, and I have an understanding of that, Your Honor, which is that he was in a nursing home at that point, and I don't know that it's utterly clear from the nursing home or from the testimony, but the impression I got from him was that the nursing home said, we have an attorney, and he can come in and do this. That's my suspicion. Well, not my suspicion. That's my impression of what happened there. So we think the trial court correctly found that all Janet did was to execute the financial details, which was all she was left with. Bud says, go do this, and she did it, and she was not the person making the difference, changing the financial plans. Plaintiff's argument two is that the trial court erred in not ruling as a matter of law that all of these accounts were convenience accounts. Now, even though that's what they say their argument is, they walk in various directions. The plaintiff, as a matter of good appellate procedure, hasn't really identified the rulings of the court. I mean, he identifies them in the aggregate that he didn't win, but he doesn't say, you know, on this day, with this ruling, with this order in the record, that this was what was done, and he doesn't even tell you precisely which motion or action on the part of the plaintiff that the trial court disagreed with him on. In the court, the plaintiff conflates a number of presumptions here, but I think we've done what we can to try to make it simple. The plaintiff says that there is a presumption of convenience accounts, and yet he never offers a citation as to what that presumption is, which we called on in our appellees' brief, and in the reply brief, there's still no mention of any case which says there is a presumption of convenience accounts. And with respect to the plaintiff's arguments regarding presumptions, there is a fascinating legal issue which we have voluntarily bypassed here, which would have been fun to debate, but we don't have to, and that is whether the presumption of constructive fraud, which arises in a transaction between a fiduciary and a principal, survives an encounter with the competing presumption of a gift, which arises from the creation of a joint bank account. Trial court reviewed the cases, said that they think, that he thought that the presumption of gift goes by the board, and we're left with the presumption of constructive fraud when you deal with a fiduciary, and we've accepted it for purposes of this appeal. And one of the reasons we've done that, in order to try to bring some sense to this case, and also to simplify it, is that we have a great deal of confidence in the quality of the evidence here, that we meet that standard of clear and convincing evidence, and we're happy to have the case decided on that basis. We are confident, you know, that you're going to find, as the trial court did, that there was clear and convincing evidence that Budd intended to make these transactions as gifts. The plaintiff completely misrepresents in the brief the essence of the trial court's ruling. Trial court commented very logically that it is hard to imagine that the CDs were created as convenience accounts. And let's just stay there for a second, and this is something that Justice Holder has touched on a moment ago. How is it convenient for writing checks, or even accessing money in any way, to have the funds locked up in a CD? And the vast part of the money in this case was payable on death, and not in joint tenancy, which speaks directly to what the intent of the decision might have been. But we digress on that, because the trial court didn't ground his ruling on the fact that you can't have, it doesn't make sense to have convenience accounts, and said, well, I observed that, but that's not what he ruled on. The trial court required defendants, us, to prove their entitlement to the CDs by clear and convincing evidence, and that's abundance in the brief, page 921 of the record, it's clear that's what he said. And the plaintiff hasn't challenged the sufficiency of the evidence. All the plaintiffs, with one exception at the end here, he's coming in here to talk about the law, and he doesn't challenge the sufficiency of the evidence on this appeal that there was clear and convincing evidence. There aren't any judicial admissions in this case. I represent the nicest people from Spring Valley. And when they were asked questions, you know, what was the intent, and then they would say something, well, you know, what he wanted to do was make sure he could pay his bills, and the plaintiff comes in and isolates phrases like that and says, these are judicial admissions, and he now criticizes the trial judge for not agreeing with him. Whether something is a convenience account or a gift is, at best for them, a mixed question of fact and law. And the Supreme Court said last year in J.P. Morgan Chase v. Earth Foods that a judicial admission cannot be made with respect to a mixed question of fact or law that is reserved for purely questions of fact. And each of the supposed snippets of testimony that the plaintiff seizes on here relate to the defendant's understanding of things. And the court said, but the controlling issue in the case is what the decedent understood and what the decedent intended, and that was the basis on which the trial court presented. The plaintiff's last argument says, well, if you don't agree that these are judicial admissions, then the evidence must be not clear and convincing, that it must be equivocal, and therefore you have an extroverted proof. And that is, as Judge Albertson would say, a false dichotomy. Just because something doesn't meet, isn't a judicial admission, doesn't mean that it can't also meet the standard of clear and convincing evidence. And I think that readily disposes of that argument. The plaintiff mentioned this morning something he said, or this afternoon rather, something he said in the brief, saying that Skinner and Hyland says that you can't consider, or actually what he said here today, was that it's not enough to have the testimony only of the donees to a transaction. And that's not what those cases say. Those cases say, look, we'll look at what the donee has to say carefully. We realize the practicalities of many situations. But nonetheless, both cases say that the testimony must be considered. And in light of all of the other circumstances in this case, there is sufficient evidence to meet the test. There's no legal limit on what the corroborative evidence can be. The court merely says there has to be something more than an unbelievable self-interested donee coming in and saying, well, it was a gift. So, and lastly on this point, it strikes me that Budd conducted all of these transactions in person himself, except for the State Bank of Spears CD, Bank of Spears CDs, which we talked about in the beginning. Other than that, he did it all. So this isn't like these other cases in which the donee signed something, where there's a question as to the authenticity of the signature. I mean, there's no doubt that he did it here. Last argument, number three. It's a combination of contentions that the trial court only made a finding that no actual fraud existed, and the assertion that the trial court's finding is against the manifest way, which is the first time he begins talking about the evidence. I think your argument is correct. I don't think I need to spend much time on them here. The trial court correctly understood that there is a presumption of fraud in the fiduciary's transactions, and there must be a showing of clear and convincing evidence. The court said that he found it was not the respondent's intention to overreach and to get their hands on their uncle's money. He said there was no expenditure that was made to benefit the respondents in any way. The trips to the banks were done primarily to take care of Budd's wishes, and that the motive or the impetus, the court's words, for going to the banks did not come from the respondents, but rather came from Budd. I have several concluding observations on the facts. First, Marlene, who's the plaintiff administrator here, having had herself appointed, talked with Budd about putting someone else's name on a CD. So when someone died, and it may have been one of his siblings or it may have been a spousal sibling, I forget, back before 2002 or before, so long before this, Marlene talked with him and said, well, don't you think you ought to put somebody's name on that CD? Thank you. And he refused. And isn't it interesting that in this entire record that the only testimony of anyone asking Budd to put their name, put a name on a CD, was that of Marlene, and in that instance he refused, even though he had been putting other people on CDs for decades. Secondly, there's no evidence contradicting the testimony concerning the horrible living conditions Budd endured before the respondents began caring for him. I don't think we need to review it here. It's pretty graphic, and it is so graphic that you would think that if it were not true, that somebody would have come in to contradict it, and there is not a word of contradiction in the evidence. Lastly, Janet, Al, Edward, and Sandy took tremendous and unselfish care of this man. He knew what he was doing to the end. There is no proof of incompetency whatsoever. I respectfully suggest, with respect to the other side, with respect to the court, that this case is meritless, and I ask that the trial court be affirmed. Thank you, Mr. Reagan. Thank you. Mr. Engle, some rebuttal. Thank you. With respect to the first issue of the violation of the Power of Attorney Act, there has been two cases which discuss, that my research has uncovered, that discuss this issue, both Romanowski and Fort Dearborn Life Insurance v. Holcomb. Both cases, I think, involve a very straightforward application of the statute and mirror my argument, which is the power to grant gifts or change the estate plan is either in the Power of Attorney document or it's not. As the courts recognized in those cases, it didn't exist. The documents were clear and unambiguous. Power of Attorneys are strictly construed, and therefore, the agents didn't have the authority to do what they did. Mr. Reagan argues that those cases should be distinguished based on the respondent's testimony, and basically only Ms. Hundenburg's testimony, that this is what Bud Wan had done. If that exception is created, not only is it not consistent with the reasoning of the statute or the language of those, or the reasonings of those cases, but the exception would swallow the rule because anybody can come in and say, this is what he wanted me to do, and there's no evidence to show otherwise. And, in fact, that's basically what happened in Fort Dearborn Life Insurance was that – I'm sorry, not Fort, in Romanowski, where the daughter said, basically, Mom wanted me to basically put this in a trust with us as beneficiaries, and the court said, yes, there was some issues as far as whether it's properly proven, but the court, Romanowski says, ultimately, it doesn't matter because whether it's – she could have all the evidence in the world, and basically it doesn't matter because the power must be specifically granted. And there's very good reasons why these powers are specifically granted because other powers that are in existence in the power of attorney, they at least require you to act essentially for – if you're going to act, you essentially are acting for the benefit of the principal. I mean, that's basically you're either paying their bills or you're selling their house, but you're doing it for their benefit. Here, basically, you're changing their statement, and presumably you're even changing it for your benefit. And the potential for fraud in those cases is just tremendous, and that's why the General Assembly sensibly put some limitations by specifically requiring those powers to be granted. And the only other basis for which the appellees argue the trial court's decision was supported is under the financial transactions exception. That was rejected essentially by both courts, both in Fort Dearborn, where they essentially rejected the catch-all exception. That was a case Mr. Reagan argued 10 years ago, I believe. They said basically the catch-all provision doesn't trump other specific provisions which require these powers to be specifically added. And in Romanowski, where basically they argued the land trust exception, the court again said no, you construe the power of attorney, it's unambiguous, the powers aren't added. That's the end of the story. With respect to the second argument regarding the CDs, counsel has argued that Mr. Itoudis about Itoudis changed these CDs, and therefore there should be no presumption of a convenience account. First, I point out that the decedents in both Skinner and Romanowski previously owned CDs, and that did not stop this court from saying no, the presumption of basically a convenience account still applies. Both those cases said before we even get to the issue of gift, because where you have a fiduciary. Counsel, you have one minute. Thank you. But where you have a fiduciary, we're not going to presume that the fiduciary broached that issue, basically engaged in this transaction until it's clear to us otherwise. So not only does the first one show that the gift was even made, but the presumption requires that then the gift be shown by clear and convincing evidence. What I think is key about this case, and which makes it indistinguishable from Heilman and Skinner, is that we have all this testimony about Bud's care of what he wanted, but as the trial court said, the entire respondent's entire case was Janet Hunenberg, and without that, the case collapses. Also, I would point out that Skinner basically said, with respect to judicial admissions in that case, that the fiduciary submission in that case that the funds belonged to Janet Skinner, the Skinner court said that was a binding admission, which should have been held binding on the parties. Counsel, your time is up. Thank you. All right. Thank you, Mr. Engel, for your argument here today. Mr. Reagan, thank you. This matter will be taken under advisement.